J-S14017-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| NICHOLAS MEAT, LLC | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PITTSBURGH LOGISTICS SYSTEMS, | : | |
| INC., D/B/A PLS LOGISTICS | : | |
| SERVICES | : | No. 1398 WDA 2021 |
| | : | |
| Appellant | : | |

Appeal from the Judgment Entered October 28, 2021
In the Court of Common Pleas of Butler County Civil Division at No(s):
2017-10872

BEFORE:   McLAUGHLIN, J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY McCAFFERY, J.:　　　　　　　**FILED:  October 4, 2022**

Pittsburgh Logistics Systems, Inc., d/b/a PLS Logistics Services (PLS) appeals from the judgment entered in the Butler County Court of Common Pleas after the trial court granted summary judgment in favor of Nicholas Meat, LLC (Nicholas Meat) in this breach of contract action.  On appeal, PLS argues the trial court erred by granting relief based upon contractual terms that were not part of the parties' agreement, and by concluding Nicholas Meat's claim was not preempted by federal law.  For the reasons below, we affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

The relevant facts underlying this breach of contract action are aptly summarized by the trial court as follows:

This action arises out of a freight-brokerage relationship between Plaintiff, [Nicholas Meat,] and Defendant, [PLS]. PLS is a freight broker that serves as an intermediary between shippers that need to transport goods and motor carriers with the capacity to move goods.[1]

In or around May 2015, Nicholas Meat and PLS began discussing the formation of a business relationship for PLS to arrange the shipment of Nicholas Meat's products on a transactional basis. To facilitate the formation of a business relationship, Nicholas Meat filled out the PLS Commercial Credit Application and executed the PLS Credit Application & Setup Form. Item 8 of the Terms and Conditions on the PLS Credit Application & Setup Form stated:

[Nicholas Meat] understands **motor carriers under contract with PLS are required to maintain cargo loss and damage liability insurance in the amount of $100,000.00 per shipment.** Load[s] valued in excess of $100,000.00 will not be tendered without advanced written notification to allow PLS and the contracted carrier the opportunity to arrange for increased insurance limits. Failure to provide written notice will result in your loads not being insured to the extent the value exceeds $100,000.00.

Additionally, PLS completed Nicholas Meat's New Carrier Information Form. PLS also provided to Nicholas Meat a Certificate of Insurance reflecting PLS's insurance coverages.

---

[1] Our Supreme Court has explained:

Freight brokers do not directly ship or transport freight; rather, they function as intermediaries which facilitate the shipment of goods. They are the "connecting link between shippers and carriers, uniting shippers who have cargo to deliver with carriers who have available motor transportation."

*S & H Transp., Inc. v. City of York*, 210 A.3d 1028, 1030–31 (Pa. 2019) (citations omitted).

PLS's Certificate of Insurance listed contingent cargo liability coverage of $250,000 per occurrence. Nicholas Meat approved PLS as a freight broker and proceeded to hire PLS to arrange shipments of Nicholas Meat goods on a transactional basis beginning in June 2015.

Before awarding shipments to a carrier, PLS collects certain information from the carrier and requires the carrier to agree to certain terms and conditions, a process known as carrier onboarding. At PLS, in 2015, carrier onboarding was handled by PLS carrier management personnel located in Ukraine. PLS required carriers to complete and submit a "Carrier Setup Packet," which in part included forms setting forth the carrier's contact information, accounts payable information, and equipment information. PLS's carrier management personnel did not routinely verify the contact information provided by a prospective carrier. In addition to the Carrier Information Packet, PLS also required prospective carriers to submit other documents, including a Certificate of Insurance, government-issued motor carrier permit, W-9 form, and cab card. PLS's carrier management personnel reviewed each certificate of insurance provided by prospective carriers to ensure that the limits of insurance coverage were correct and to make sure there were no other exceptions on the insurance certificate. PLS carrier management personnel did not routinely contact the insurance agent or broker listed on a prospective carrier's Certificate of Insurance. Once a prospective carrier was approved by PLS, the carrier would gain access to PLS Pro, PLS's electronic transportation management system. Once a carrier was made active in PLS Pro, the carrier could view upcoming shipments and could be selected to transport shipments for PLS's shipper-customers, without additional vetting.

On October 27, 2015, a person or entity holding itself out as GA Trucking (the "Carrier") submitted its Carrier Setup Packet and related documents, including a certificate of insurance to PLS. **PLS did not verify that the Carrier's contact information or certificate of insurance was legitimate.** In November 2015, PLS awarded a shipment to the Carrier for another customer.

In November 2015, Nicholas Meat asked PLS to arrange to ship two loads of boneless beef trimmings from Nicholas Meat's facility in Loganton, Pennsylvania on November 21, 2015 for delivery to Cargill Meat Solutions in Milwaukee, Wisconsin on November 23, 2015 (the "Cargill Load"). The Cargill Load

consisted of two separate loads for which Nicholas Meat was to be paid $53,353.33 and $54,846.77 upon delivery to its customer, Meyer Natural Foods. At a total value of $108,200.10, Nicholas Meat required the carrier of the Cargill Load to have $150,000.00 in cargo liability insurance coverage. The shipment arrangements made between PLS and Nicholas Meat regarding the Cargill Load are documented, in part, through email between the parties and evidenced by PLS's Award Confirmation.

The Cargill Load was not delivered to its destination, and it was discovered that the GA Trucking's identity had been stolen. The truck used to pick up the Cargill Load was found abandoned and empty on November 24, 2015. The contents of the Cargill Load were never found. It was determined that the Certificate of Insurance presented to PLS by the Carrier (purporting to be GA Trucking) contained a fabricated insurance agent with a non-existent email address and the phone number of a random, unrelated residence. The insurance policy reflected on the Carrier's Certificate of Insurance did not exist. The real GA Trucking did not carry cargo insurance.

Trial Ct. Memorandum Op., 10/27/21, at 5-7 (emphases added).

In October of 2016, Nicholas Meat filed a civil action against PLS in Clinton County, Pennsylvania. The lawsuit was subsequently transferred to Butler County. On November 26, 2019, Nicholas Meat filed a first amended complaint asserting claims for breach of contract, promissory estoppel, negligence, negligent misrepresentation, and vicarious liability. With regard to its breach of contract claim, Nicholas Meat asserted that, pursuant to the "Terms and Conditions" of their agreement, "motor carriers under contract with PLS were required to maintain cargo loss and damage liability insurance in the amount of $100,000.00[,]" or more if Nicholas Meat provided the requisite advance notification. Nicholas Meat's First Amended Complaint, 11/26/19, at 28-29; *see also id.* at Exhibit 1, PLS Credit Application & Setup

Form, 5/27/15, Terms & Conditions (PLS Terms & Conditions) at ¶ 8. Nicholas Meat provided the requisite advance notification with respect to the Cargill Load, which required the carrier to have $150,000.00 in insurance. *See* Nicholas Meat's First Amended Complaint at 29. However, "PLS breached its own Terms and Conditions . . . because it did not in fact require that the Carrier selected to transport the Cargill Load maintain the necessary cargo loss and damage liability insurance." *Id.* Further, Nicholas Meat asserted that as a result of PLS's breach, it incurred "significant damages[.]" *Id.*

PLS filed preliminary objections in December of 2019, followed by amended preliminary objections in March of 2020. Relevant herein, it asserted, *inter alia*, that Nicholas Meat's claims were preempted by federal law, in particular the Carmack Amendment[2] to the Interstate Commerce Act.[3] *See* PLS's Amended Preliminary Objections, 3/18/20, at 5-7. On July 13, 2020, the trial court overruled PLS's federal preemption preliminary objection.[4] Order, 7/13/20, at 1 (unpaginated).

_____

[2] The Carmack Amendment provides, in relevant part, that a carrier must issue a bill of lading for property it receives for transportation, and that the carrier is then liable for the loss or injury to the property "caused by (A) the receiving carrier, (B) the delivering carrier, or (C) another carrier over whose line or route the property is transported" to the person entitled to recover under the bill of lading. *See* 49 U.S.C. § 14706(a)(1).

[3] 49 U.S.C. §§ 101-80504.

[4] In the July 13th order, the trial court also: (1) overruled PLS's preliminary objection asserting Nicholas Meat's negligence claims were barred by the gist of the action doctrine, but did so without prejudice to PLS to raise the issue in
*(Footnote Continued Next Page)*

- 5 -

On September 11, 2020, Nicholas Meat filed a motion for summary judgment. It argued that PLS breached the terms of Item 8 in the parties' agreement by failing to ensure the motor carrier it hired "'maintain[ed]' adequate and legitimate cargo liability insurance[.]" Nicholas Meat's Motion for Summary Judgment, 8/11/21, at 41. It also asserted that PLS violated "the implied duty of good faith and fair dealing." *Id.* at 46. Alternatively, Nicholas Meat argued it was entitled to relief on its claims for negligence — PLS negligently hired and supervised the carrier, and negligently misrepresented its carrier vetting process — or promissory estoppel based upon the promises PLS made "to Nicholas Meat in order to induce Nicholas Meat to business with it." *Id.* at 50, 53-54, 56.

PLS filed a competing motion for summary judgment on September 2, 2021. First, it insisted Nicholas Meat's claims were preempted by federal law, including the Interstate Commerce Commission Termination Act (ICCTA), 49 U.S.C. § 14501(b), the Federal Aviation Administration Authorization Act (FAAAA), 49 U.S.C. § 14501(c), as well as the Carmack Amendment. PLS's Motion for Summary Judgment, 9/2/21, at 10-11. Further, PLS argued that it did not breach any terms of the parties' agreement, but rather, it "did require that its contracted third-party motor carriers maintained $100,000 in cargo loss and damage liability insurance[,]" and, specifically, required GA

_____

a motion for summary judgment; and (2) sustained PLS's preliminary objection to Nicholas Meat's claim for punitive damages, striking those paragraphs from the complaint. *See* Order, 7/13/20, at 1 (unpaginated).

Trucking to certify that it carried $150,000 of coverage for the Cargill Load. *Id.* at 14-15. PLS also repeated its contention that the tort claims were barred by the "gist of the action" doctrine,[5] and argued that Nicholas Meat failed to prove its claim for promissory estoppel. *See id.* at 9, 21.

The trial court conducted oral argument on October 15, 2021. Thereafter, on October 27th, the court entered an order: (1) granting Nicholas Meat's motion for summary judgment with respect to its breach of contract claim; (2) denying PLS's motion with respect to its federal preemption argument; and (3) granting PLS's motion for summary judgment with respect to the negligence claims. *See* Order, 10/27/21, at 1-2 (unpaginated). The next day, the trial court entered judgment in favor of Nicholas Meat in the amount of $108,200.10, plus prejudgment interest from November 24, 2015. This timely appeal by PLS followed.[6, 7]

_____

[5] "Under the 'gist of the action' doctrine, an alleged tort claim against a party to a contract is barred when the 'gist' of the cause of action, although sounding in tort, is in actuality a claim for breach of contractual obligations." *Patel v. Kandola Real Est., LP*, 271 A.3d 421, 431 (Pa. Super. 2021) (citation omitted).

[6] PLS complied with the trial court's directive to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The trial court filed a brief Rule 1925(a) opinion on December 30, 2021. Nicholas Meat did not appeal from the ruling of the trial court concerning its negligence claims.

[7] Upon initial review of this appeal, this Court observed that the trial court's October 27th order did not dispose of Count V in Nicholas Meat's complaint, which asserted a cause of action for promissory estoppel. Accordingly, on January 28, 2022, this Court issued PLS a rule to show cause why the order on appeal was final. *See* Order, 1/28/22. PLS filed a timely response,

*(Footnote Continued Next Page)*

PLS presents two issues for our review:

Whether the [trial] court erred in its October 27, 2021 order of court, as explained in its accompanying Memorandum, by:

    a. creating contractual terms that were not part of the agreement between [PLS] and [Nicholas Meat; and]

    b. holding [Nicholas Meat's] breach of contract claim was not preempted by federal law.

PLS's Brief at 10 (some capitalization omitted).

Our review of an order granting summary judgment is guided by the following:

When a party seeks summary judgment, a court shall enter judgment whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense that could be established by additional discovery. A motion for summary judgment is based on an evidentiary record that entitles the moving party to a judgment as a matter of law. In considering

_____

asserting that the promissory estoppel cause of action was pled as an alternative to the breach of contract claim, and because the court granted relief on the contract claim, the promissory estoppel claim is now moot. *See* PLS's Letter Response, 2/11/22, at 1-3 (unpaginated). This Court discharged the rule to show cause by order dated February 18, 2022.

Upon our review, we agree that the trial court's October 27, 2022, order effectively disposed of "all claims and of all parties." *See* Pa.R.A.P. 341(b)(1). "The doctrine of promissory estoppel allows a party, under certain circumstances, to enforce a promise even though that promise is not supported by consideration." ***Shoemaker v. Commonwealth Bank***, 700 A.2d 1003, 1006 (Pa. Super. 1997). As the trial court explained in its opinion, "[d]ue to [its] determination that PLS breached a **contractual obligation**, the issue of promissory estoppel [need] not be addressed." Trial Ct. Memorandum Op. at 16 (emphasis added). Nicholas Meat pled a claim of promissory estoppel as an alternative to its breach of contract claim. The court's ruling granting Nicholas Meat relief on its contract claim renders the estoppel claim moot. Thus, we agree the court's October 27th order is a final, appealable order.

the merits of a motion for summary judgment, a court views the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Finally, the court may grant summary judgment only when the right to such a judgment is clear and free from doubt. An appellate court may reverse the granting of a motion for summary judgment if there has been an error of law or an abuse of discretion. . . .

***Gallagher v. GEICO Indem. Co.***, 201 A.3d 131, 136–37 (Pa. 2019) (citations & quotation marks omitted).

In its first issue, PLS argues the trial court erred or abused its discretion when it granted summary judgment to Nicholas Meat on the breach of contract claim.

A breach of contract claim consists of the three elements: "[(1)] the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." ***Burlington Coat Factory of Pennsylvania, LLC v. Grace Const. Mgmt. Co., LLC***, 126 A.3d 1010, 1018 (Pa. Super. 2015) (*en banc*) (citation omitted). When interpreting the meaning of a contract, the fundamental rule "is to acertain and give effect to the intent of the parties." ***Binswanger of Pennsylvania, Inc. v. TSG Real Est. LLC***, 217 A.3d 256, 262 (Pa. 2019). Our Supreme Court has explained:

[T]he intent of the parties to a contract is to be regarded as embodied in the writing itself, and, as such, the entire agreement must be taken into account in determining contractual intent. Indeed, a reviewing court does not assume that contractual language is chosen carelessly, nor does it assume that the parties were ignorant of the meaning of the language they employed; thus, when a writing is clear and unequivocal, its meaning must be determined only by its terms. Related thereto, [b]efore a court

will interpret a provision in a statute or in a contract in such a way as to lead to an absurdity or make the statute or contract ineffective to accomplish its purpose, it will endeavor to find an interpretation which will effectuate the reasonable result intended.

*Id.* (citations & quotation marks omitted).

This Court has also "accepted the principle . . . that [e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement."[8] *Stamerro v. Stamerro*, 889 A.2d 1251, 1259 (Pa. Super. 2005) (citation & quotation marks omitted). Instances of bad faith include the "lack of diligence and slacking off," as well as "willful rendering of imperfect performance[.]" *Id.* (citation omitted). However, the implied duty of good faith "cannot trump the express provisions in the contract[;]" instead it is utilized by the court to "harmonize the reasonable expectation of the parties with the intent of the contractors and the terms in their contract." *Id.* (citation omitted).

With this background in mind, we consider PLS's argument on appeal. PLS insists that the essential terms of its contract with Nicholas Meat were the following: (1) PLS would arrange for Nicholas Meat's freight to be transported by a third-party carrier; (2) the third-party carrier would be required to maintain cargo loss and damage liability insurance in the amount of $100,000, or a higher specified value if Nicholas Meat provided written notice in advance;

---

[8] Additionally, "[t]he General Assembly intentionally imposed an affirmative good faith requirement upon parties to commercial contracts" in the Uniform Commercial Code. *Hanaway v. Parksburg Group, LP*, 168 A.3d 146, 157 (Pa. 2017). *See* 13 Pa.C.S. § 1304 ("Every contract or duty within this title imposes an obligation of good faith in its performance and enforcement.").

(3) because Nicholas Meat did so, PLS would require the carrier of the Cargill Load to have $150,000 in insurance; and (4) Nicholas Meat would pay PLS within 30 days of receiving an invoice. **See** PLS's Brief at 24-25. However, it contends Nicholas Meat requested the trial court read into the contract additional, non-existent terms, requiring PLS to vet its third-party carriers by contacting the carrier's insurers "to confirm the legitimacy of the insurance information [the carrier] provided to PLS[;]" and "reimburse [Nicholas Meat] for cargo loss in the event the insurers for the carrier and/or PLS do not[.]" **Id.** at 25-26 (record citations omitted). PLS contends the trial court accepted these additional terms and improperly granted relief on that basis. **See id.** at 26-27.

Moreover, PLS insists it did not breach the terms of the parties' agreement because it is "undisputed that PLS **did require** [the third-party carrier,] GA Trucking, or who they believed to be GA Trucking, to carry $150,000 in cargo coverage, as evidenced by the GA Trucking Certificate of Liability submitted to PLS." PLS's Brief at 27-28 (emphasis added). PLS asserts that "[n]owhere in the contract was there an obligation for PLS to take further action[,]" and "[a]t most, an obligation to take reasonable steps for verification creates questions of fact" precluding summary judgment. **Id.** at 33. For support, it cites **Marx Companies, LLC v. W. Trans Logistics, Inc.**, 2015 WL 260914 (D.N.J. 2015), an unpublished federal district court decision, which it claims is "almost analogous . . . to this matter." **Id.** at 28. Furthermore, PLS contends that Nicholas Meat's damages did not result from

- 11 -

any contractual breach, but rather, its own "failure to file a claim under PLS's contingent cargo policy, which listed Nicholas Meat as a loss payee." ***Id.*** at 34.

The trial court addressed Nicholas Meat's breach of contract claim as follows:

> There is no dispute that a contract existed between PLS and Nicholas Meat which provided for PLS, as a transportation broker, to arrange for Nicholas Meat's freight to be transported by a third[-]party motor carrier. An essential term of the contract was that PLS would require the motor carrier it selected for the Cargill Load to carry $150,000.00 in cargo loss and damage liability insurance. PLS assumed a contractual obligation to ensure that the motor carrier selected had the specified insurance. Inherent within this obligation was a duty to take reasonable steps to verify that the cargo liability insurance information provided by the carrier was legitimate. PLS breached the terms of the contract by arranging for the Cargill Load to be transported by a third[-]party motor carrier without **any** cargo loss and damage liability insurance. If the Cargill Load had been successfully delivered, Nicholas Meat would have been paid $108,200.10 by its customer. Therefore, as a result of PLS's breach of a duty imposed by the contract, Nicholas Meat suffered damages in the amount of $108,200.10.

Trial Ct. Memorandum Op. at 8-9.

We agree with the trial court's interpretation of the parties' agreement, and its conclusion that PLS breached that agreement, resulting in Nicholas Meat's damages. The agreement provided, *inter alia*, that PLS would **require** its third-party carriers to "maintain cargo loss and damage liability insurance in the amount of $100,000.00 per shipment[,]" or more as requested by its clients. ***See*** PLS Terms & Conditions at ¶ 8. PLS would have us conclude that it fulfilled its duty simply by asking the third-party carrier if it had the requisite

insurance and collecting a copy of a purported insurance certificate. According to PLS, the fact that the carrier — which was an imposter posing as GA Trucking — presented a fabricated insurance certificate, does not mean that it failed to perform its contractual obligations; rather, PLS emphasizes that it, too, was defrauded. **See** PLS's Brief at 27-28.

Contrary to PLS's argument, the trial court did not add contractual terms to the agreement. Pursuant to the clear terms of the parties' agreement, PLS owed a duty to Nicholas Meat to **require** its carriers maintain the requisite cargo insurance. Here, the carrier that PLS arranged to transport the Cargill Load did not have **any** cargo insurance. Thus, PLS breached a duty owed to Nicholas Meat under the agreement.

PLS further argues that the court's determination that it did not take "reasonable steps" to verify the insurance information provided by its carriers, created a question of fact, precluding summary judgment. **See** PLS's Brief at 33. We disagree. Had PLS taken **any** steps to verify the insurance policy information provided by GA Trucking, we might agree that a genuine issue of material fact existed precluding summary judgment; the question of how much verification is sufficient would be for the jury. Here, however, PLS concedes it did nothing — rather, PLS merely accepted, at face value, the fabricated insurance certificate from GA Trucking, which falsely claimed it had the appropriate amount of cargo insurance. Thus, we agree with the determination of the trial court that PLS's good faith obligation under its own Terms and Conditions required more. That is not to say we are adding more

terms to the contract. Instead, as noted above, "[e]very contract imposes upon each party a duty of good faith and fair dealing[,]" which the court may consider so long as the implied duty does not "trump the express provisions in the contract[.]" **Stamerro**, 889 A.2d at 1259 (citation omitted). Here, the express terms of the agreement provided that PLS would **require** its carriers to have a certain amount of cargo insurance. Clearly, this requirement implied that PLS — as a broker — would verify the information provided by prospective carriers.

We also conclude PLS's reliance on **Marx** is misplaced. First, **Marx** is a decision issued by a New Jersey federal district court; thus, it is not binding on this Court. **See Huber v. Etkin**, 58 A.3d 772, 779 n.7 (Pa. Super. 2012) (*en banc*) (federal district court decisions are "not binding authority" but may be cited for persuasive value). Second, we conclude the decision is distinguishable on its facts.

In **Marx**, as in the present case, the plaintiff contracted with a shipping broker to assist in transporting two truckloads of frozen beef. **See Marx**, 2015 WL 260914 at *1. The contract provided, in relevant part, that the broker "was a responsible third party that had an extensive nationwide network of reliable carriers." **Id.** (record citation & quotation marks omitted). The broker "arranged for transportation with Dew–Right Transportation, Inc. ('DRT'), a company with which it had no prior business dealings but which it believed held the appropriate Department of Transportation credentials." **Id.** at *2. However, the goods were never delivered, and the plaintiff believed

- 14 -

they were stolen by DRT. **See id.** The plaintiff subsequently sued the broker claiming it breached two "implied duties" — *i.e*, that it would (a) act according to the standard for a professional freight broker, and (b) retain only reliable carriers — and the "express promise" in their agreement that the broker was a "responsible third party that had an extensive nationwide network of reliable carriers." **Id.** (record citations omitted). The plaintiff argued the broker breached its duties "by retaining a carrier about which [the broker] had no information and by retaining a carrier that was not insured." **Id.** (record citation & quotation marks omitted).

In dismissing the plaintiff's complaint, the district court first construed the argument concerning the "implied duties" as a negligence claim, and determined it was preempted by the FAAAA.[9] **See Marx**, 2015 WL 260914 at **2 n.2, 3-4. Moreover, with regard to the plaintiff's breach of contract claim, the court agreed with the broker that "the contractual promise that was allegedly violated [was] not found in the parties' written agreement." **Id.** at *4. Indeed, on appeal, the plaintiff argued solely that the "promise at issue was 'implied.'" **Id.** Because the complaint did not contain any allegation that the broker breached an implied promise, and, in any event, such a claim would be "outside the confines of the express contractual agreement between the parties[,]" the district court concluded that the plaintiff "failed to plead a plausible claim" and dismissed the complaint. **Id.** at **4-5.

---

[9] We will address PLS's federal preemption argument **infra**.

Here, unlike in **Marx**, the trial court found PLS breached a **specific term** of the parties' agreement — namely, that it would require its carriers to have a certain amount of cargo insurance. Nicholas Meat's claim does not rest upon PLS's breach of an **implied** agreement, as in **Marx**. Indeed, the relevant provision of the **Marx** contract provided only that the broker was a "responsible third party that had an extensive network of reliable carriers." **See Marx**, 2015 WL 260914 at *1. The broker's use of a new, untested carrier in that case did not establish a breach of that clause in the agreement. Thus, **Marx** provides PLS with no basis for relief.

Lastly, we note PLS asserts, alternatively, that even if we conclude it breached the terms of the parties' agreement, "Nicholas Meat's alleged damages were not a direct result of any contractual breach . . ., but [instead due to] Nicholas Meat's failure to file a claim under PLS's contingent cargo policy, which listed Nicholas Meat as a loss payee." PLS's Brief at 34. The trial court concluded that "Nicholas Meat was not required to attempt recovery through PLS's insurance policy." Trial Ct. Memorandum Op. at 16. PLS provides no record citation or authority to the contrary. Rather its "argument" is confined to a single sentence in its brief, and, therefore, waived for our review. **See** Pa.R.A.P. 2119(a) (requiring argument in brief to include "such discussion and citation to authorities as are deemed pertinent"). Thus, PLS's first claim fails.

Next, PLS argues that Nicholas Meat's breach of contract claim was preempted by federal law, specifically the Carmack Amendment, the ICCTA,

- 16 -

and the FAAAA.  PLS's Brief at 35.  PLS maintains that the trial court erred

when it rejected his claim by analyzing the statutes separately.  *Id.* at 36.

Rather, PLS insists "it is the interplay of the statutes together that results in

Nicholas Meat['s] claim . . . being preempted."  *Id.*

When considering whether a federal statue preempts state law, we are

guided by the following:

> Congress has the undisputed power to preempt state law in areas of federal concern.  Such preemption does not need to be explicit in a statute invalidating a state law.  **If the area in question is one of traditional state concern, it should be presumed that Congress did not intend to supersede state authority absent a clear and manifest legislative purpose to the contrary.**
>
> Congress' intent to preempt state law may be express or implied and found in any of three ways:
>
> > First, state law may be preempted where the United States Congress enacts a provision which expressly preempts the state enactment.  Likewise, preemption may be found where Congress has legislated in a field so comprehensively that it has implicitly expressed an intention to occupy the given field to the exclusion of state law.  Finally, a state enactment will be preempted where a state law conflicts with a federal law. Such a conflict may be found in two instances, when it is impossible to comply with both federal and state law, or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Stone Crushed Partnership v. Kassab Archbold Jackson & O'Brien*, 908

A.2d 875, 880–81 (Pa. 2006) (citations omitted & emphasis added).

The three statutory provisions at issue herein involve the federal government's regulation of transportation. With regard to the Carmack Amendment, the Third Circuit Appeals Court has explained:[10]

> The Carmack Amendment's operation is relatively straightforward. The general rule is that an interstate carrier is strictly liable for damages up to "the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) [certain intermediary carriers]." 49 U.S.C. § 14706(a)(1). A shipper and carrier can agree to limit the carrier's liability "to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances" in order for the shipper to obtain a reduced rate. *Id.* [at] § 14706(c)(1)(A). Shippers may bring a federal private cause of action directly under the Carmack Amendment against a carrier for damages. *Id.* [at] § 14706(d).

***Certain Underwriters at Int. at Lloyds of London v. United Parcel Serv. of Am., Inc.***, 762 F.3d 332, 335 (3d Cir. 2014) (footnote omitted).

The ICCTA, codified at 49 U.S.C. § 14501(b)(1) provides, in relevant part:

> [N]o State . . . shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to intrastate rates, intrastate routes, or intrastate services of any freight forwarder or **broker**.

49 U.S.C. § 14501(b)(1) (emphasis added). Subsection (c)(1) codifies a similar provision found in the FAAAA:

---

[10] As we noted ***supra***, while federal court decisions are not binding on this Court, they may have persuasive value, particularly, here, where our research has uncovered no Pennsylvania decisions on this matter. ***See Huber***, 58 A.3d at 779 n.7.

> [A] State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier, **broker**, or freight forwarder with respect to the transportation of property.

49 U.S.C. § 14501(c)(1) (emphasis added).

Here, PLS argues the Carmack Amendment "impliedly preempts state law claims by shippers, such as Nicholas Meat, against brokers, such as PLS, while the ICCTA . . . and FAAAA . . . explicitly preempt any such claims by prohibiting state regulation of intrastate services of any . . . broker . . . related to a price, route or service of any . . . broker[.]" PLS's Brief at 46 (quotation marks omitted). PLS relies, primarily, on the following three federal court decisions, which it insists support federal preemption of Nicholas Meat's breach of contract claim: *AMG Resources Corp. v. Wooster Motor Ways, Inc.*, 2020 WL 110230 (3d Cir. 2020), *Alpine Fresh, Inc. v. Jala Trucking Corp.*, 181 F.Supp.3d 250 (D.N.J. 2016), and *Ameriswiss Technology, LLC v. Midway Line of Illinois, Inc.*, 888 F.Supp.2d 197 (D.N.H. 2012).

In its opinion, the trial court provided an extensive analysis supporting its conclusion that the Carmack Amendment does not bar state law claims against brokers. *See* Trial Ct. Memorandum Op. at 11-14 (determining (1) text of Carmack Amendment explicitly applies only to carriers and not to brokers; (2) *AMG* is distinguishable on its facts because (a) the shipper "raised both state-law claims and a claim under the Carmack Amendment against two entities, a carrier and a broker [which] shared an address and had common ownership[;]" and (b) the *AMG* Court did not distinguish between

- 19 -

the carrier and broker in its analysis; (3) the Carmack Amendment contains a savings clause that preserves "remedies existing under another law[;]" so that, (4) "the Carmack Amendment should not be read to displace all actions against entities . . . for which it does not provide liability"). We agree with the court's analysis, and rest upon its well-reasoned basis. Thus, we conclude Nicholas Meat's breach of contract claim is not preempted by the Carmack Amendment.

Nevertheless, as the trial court acknowledges in its opinion, the above-cited provisions of the ICCTA and FAAAA do — by their very terms — apply to freight brokers, such as PLS. **See** Trial Ct. Memorandum Op. at 14. **See also** 49 U.S.C. § 14501(b)(1), (c)(1). However, the court concluded, and we agree, that "there is a widespread consensus among courts analyzing these provisions that . . . they do not preempt **breach of contract** claims against freight brokers." Trial Ct. Memorandum Op. at 14-15 (emphasis added) (citing cases). **See Louis M. Marson Jr., Inc. v. Alliance Shippers, Inc.**, 438 F. Supp. 3d 326, 335 (E.D. Pa. 2020) ("[T]he FAAAA and ICCTA do not preempt routine breach of contract claims.") (citation omitted).

The two decisions upon which PLS relies do not compel a different result. In **Alpine Fresh**, a shipper filed a complaint seeking damages from both a broker and motor carrier when its shipment of produce was rejected at the point of delivery because the internal temperature of the truck was incorrect. **See Alpine Fresh**, 181 F.Supp.3d at 253. The shipper asserted claims for breach of contract, breach of bailment, and negligence. The broker filed a

motion to dismiss the breach of bailment and negligence claims, arguing those claims were preempted by federal law, namely, the Carmack Amendment, the ICCTA, and the FAAAA. *See id.* at 254. The federal district court agreed and dismissed those counts in the complaint. *See id.* at 257. Significantly, however, the broker did not challenge — and the district court did not address — whether the shipper's **breach of contract claim** against the broker was also preempted by federal law. Thus, *Alpine Fresh* does not support PLS's claim here.

The same is true of the decision in *Ameriswiss*. In that case, a shipper contracted with a broker to transport machinery. *See Ameriswiss*, 888 F.Supp.2d at 200. The broker, in turn, hired a carrier. *Id.* During transportation of the machinery, the carrier was involved in an accident, and the machinery was destroyed. *Id.* The shipper subsequently filed a lawsuit against both the broker and carrier, asserting claims for negligence and breach of contract against the broker, and a Carmack Amendment claim against the carrier. *Id.* The broker moved for summary judgment on both claims, arguing that the **negligence claim** was preempted by federal law, and the breach of contract claim failed as a matter of law. *See id.* at 201. The district court agreed. It concluded that the negligence claim was either "subject to implied preemption under the Carmack Amendment [or] expressly preempted by the ICCTA." *Id.* at 205. However, the court found the breach of contract claim failed on its merits. *See id.* at 209-10. Thus, like *Alpine Fresh*, the decision in *Ameriswiss* does not support PLS's claim.

- 21 -

Accordingly, we agree with the trial court's determination that Nicholas Meat's breach of contract claim is not preempted by the Carmack Amendment, which applies only to claims against carriers, nor by the ICCTA or FAAAA, which do not preempt common law breach of contract claims. Consequently, PLS's second issue merits no relief.

We direct that a copy of the trial court's October 27, 2021, opinion be filed along with this memorandum and attached to any future filings in this case.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/04/2022

# IN THE COURT OF COMMON PLEAS OF BUTLER COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| NICHOLAS MEAT, LLC, | : | CIVIL DIVISION |
| | : | |
| Plaintiff, | : | A.D. No. 2017-10872 |
| | : | |
| v. | : | |
| | : | |
| PITTSBURGH LOGISTICS SYSTEMS, INC. | : | |
| d/b/a PLS LOGISTICS SERVICES, | : | |
| | : | |
| Defendant. | : | |

For the Plaintiff:                    Jeremy R. Lacks, Esquire

For the Defendant:                    Joseph John Joyce, Esquire
                                      Benjamin Steinberg, Esquire

DOERR, P.J.                           DATE:  October 2 7, 2021

---

## MEMORANDUM OPINION

Before this Court for disposition are opposing Motions for Summary Judgment. Upon consideration of the Motions for Summary Judgment and Briefs and Memoranda of Law in support and in opposition, the pleadings, arguments of counsel, and for the following reasons, the Court concludes Plaintiff's Motion for Summary Judgment shall be granted as to Breach of Contract, Count III of Plaintiff's First Amended Complaint; and Defendant's Motion for Summary Judgment shall be granted in part and denied in part.

## I. Procedural History

This action commenced upon Plaintiff filing a Complaint in Civil Action in Clinton County on October 26, 2016, wherein Plaintiff alleged causes of action for negligence, negligent misrepresentation, breach of contract, vicarious liability, and promissory estoppel. Preliminary objections were filed on April 24, 2017, which included an objection to venue. In an Order of Court dated August 9, 2017, the Honorable Michael F. Salisbury found venue was improper in Clinton County and directed the matter to be transferred to Butler County without ruling on the remaining preliminary objections. The case was received in Butler County on September 25, 2017.

The remaining preliminary objections were ruled on in an Order of Court entered on December 22, 2017, by the Honorable Marilyn J. Horan, which stated:

> [T]he Preliminary Objections to gist of the action on promissory estoppel are overruled, because promissory estoppel is not a tort.
>
> In relation to promissory estoppel arguments that they should not be pled in the alternative because the pleadings in the Complaint allege a contract and breach, those objections are overruled. Promissory estoppel is an alternative theory for recovery. At this stage of the pleadings, those objections are overruled.
>
> In relation to the Preliminary Objections with regard to vicarious liability, at this stage of the pleadings, said Preliminary Objections are overruled.
>
> Finally, the defense Preliminary Objections, citing gist of the action, for the torts of negligence and negligent misrepresentation, at this stage of the pleadings, said Preliminary Objections are overruled.

An Answer and New Matter was filed by Defendant on January 16, 2018. On June 11, 2019, Defendant filed a Motion for Summary Judgment and on August 14, 2019, Defendant's Motion for Summary Judgment was denied without prejudice to raise the issues on a motion for summary judgment after the completion of discovery.

2

On November 6, 2019, the Court granted Plaintiff's Motion for Leave to File a First Amended Complaint and the same was filed on November 26, 2019. Plaintiff's First Amended Complaint contains the following causes of action: Count I – Negligence, Count II – Negligent Misrepresentation, Count III – Breach of Contract, Count IV – Vicarious Liability, and Count V – Promissory Estoppel.

Preliminary Objections to Plaintiff's First Amended Complaint were filed on behalf of Defendant on December 19, 2019. Defendant's Motion for Leave of Court to file Amended Preliminary Objections was granted in an Order of Court entered on March 31, 2020. Defendant's Amended Preliminary Objections to First Amended Complaint were filed on March 18, 2020. Following Oral Argument, in an Opinion and Order of Court entered on July 13, 2020, this Court 1) declined to make a determination on gist of the action at the preliminary objection stage of the proceedings, consistent with Judge Horan's ruling; 2) determined that the Carmack Amendment does not bar state law claims against brokers; and 3) held that the facts were not sufficient to support a punitive damages claim.

Defendant's Answer with New Matter to Plaintiff's First Amended Complaint was filed on August 7, 2020, and Plaintiff's Reply thereto was filed on August 27, 2020.

Plaintiff filed a Motion for Summary Judgment and Memorandum of Law in Support thereof on August 11, 2021. Defendant filed a Brief in Opposition on October 8, 2021. Plaintiff subsequently filed a Reply Memorandum in further support of its Motion for Summary Judgment on October 13, 2021.

Defendant filed a Motion for Summary Judgment and Brief in Support thereof on September 2, 2021. On October 7, 2021, Plaintiff filed a Response and Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment.

3

On September 1, 2021, Defendant filed a Motion for Leave to File First Amended New Matter to First Amended Complaint, which was granted by Order of Court dated September 9, 2021. Thereafter, on September 20, 2021, Defendant's First Amended New Matter to First Amended Complaint was filed. Plaintiff filed a Reply to Defendant's First Amended New Matter to Plaintiff's First Amended Complaint on October 7, 2021.

Oral Argument on the Motions for Summary Judgment was held on October 15, 2021, with the above-designated attorneys appearing on behalf of their respective clients.

## II. Legal Standard

The Pennsylvania Rules of Civil Procedure provide that a party may move for summary judgment in whole or in part as a matter of law:

> (1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or
> (2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. No. 1035.2. In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Sevast v. Kakouras*, 915 A.2d 1147, 1152–53 (Pa. 2007); *Jones v. SEPTA*, 772 A.2d 435, 438 (Pa. 2001). The court may grant summary judgment only when the right to such a judgment is clear and free from doubt. *Marks v. Tasman*, 589 A.2d 205, 206 (Pa. 1991).

4

## III. Discussion

This action arises out of a freight-brokerage relationship between Plaintiff, Nicholas Meat, LLC ("Nicholas Meat") and Defendant, Pittsburgh Logistics Systems, Inc. ("PLS"). PLS is a freight broker that serves as an intermediary between shippers that need to transport goods and motor carriers with the capacity to move goods.

In or around May 2015, Nicholas Meat and PLS began discussing the formation of a business relationship for PLS to arrange the shipment of Nicholas Meat's products on a transactional basis. To facilitate the formation of a business relationship, Nicholas Meat filled out the PLS Commercial Credit Application and executed the PLS Credit Application & Setup Form. Item 8 of the Terms and Conditions on the PLS Credit Application & Setup Form stated:

> [Nicholas Meat] understands motor carriers under contract with PLS are required to maintain cargo loss and damage liability insurance in the amount of $100,000.00 per shipment. Load valued in excess of $100,000.00 will not be tendered without advanced written notification to allow PLS and the contracted carrier the opportunity to arrange for increased insurance limits. Failure to provide written notice will result in your loads not being insured to the extent the value exceeds $100,000.00.

Additionally, PLS completed Nicholas Meat's New Carrier Information Form. PLS also provided to Nicholas Meat a Certificate of Insurance reflecting PLS's insurance coverages. PLS's Certificate of Insurance listed contingent cargo liability coverage of $250,000 per occurrence. Nicholas Meat approved PLS as a freight broker and proceeded to hire PLS to arrange shipments of Nicholas Meat goods on a transactional basis beginning in June 2015.

Before awarding shipments to a carrier, PLS collects certain information from the carrier and requires the carrier to agree to certain terms and conditions, a process known as carrier onboarding. At PLS, in 2015, carrier onboarding was handled by PLS carrier management

5

personnel located in Ukraine. PLS required carriers to complete and submit a "Carrier Setup Packet," which in part included forms setting forth the carrier's contact information, accounts payable information, and equipment information. PLS's carrier management personnel did not routinely verify the contact information provided by a prospective carrier. In addition to the Carrier Information Packet, PLS also required prospective carriers to submit other documents, including a Certificate of Insurance, government-issued motor carrier permit, W-9 form, and cab card. PLS's carrier management personnel reviewed each certificate of insurance provided by prospective carriers to ensure that the limits of insurance coverage were correct and to make sure there were no other exceptions on the insurance certificate. PLS carrier management personnel did not routinely contact the insurance agent or broker listed on a prospective carrier's Certificate of Insurance. Once a prospective carrier was approved by PLS, the carrier would gain access to PLS Pro, PLS's electronic transportation management system. Once a carrier was made active in PLS Pro, the carrier could view upcoming shipments and could be selected to transport shipments for PLS's shipper-customers, without additional vetting.

On October 27, 2015, a person or entity holding itself out as GA Trucking (the "Carrier") submitted its Carrier Setup Packet and related documents, including a certificate of insurance to PLS. PLS did not verify that the Carrier's contact information or certificate of insurance was legitimate. In November 2015, PLS awarded a shipment to the Carrier for another customer.

In November 2015, Nicholas Meat asked PLS to arrange to ship two loads of boneless beef trimmings from Nicholas Meat's facility in Loganton, Pennsylvania on November 21, 2015 for delivery to Cargill Meat Solutions in Milwaukee, Wisconsin on November 23, 2015 (the "Cargill Load"). The Cargill Load consisted of two separate loads for which Nicholas Meat was to be paid $53,353.33 and $54,846.77 upon delivery to its customer, Meyer Natural Foods. At a

6

total value of $108,200.10, Nicholas Meat required the carrier of the Cargill Load to have $150,000.00 in cargo liability insurance coverage. The shipment arrangements made between PLS and Nicholas Meat regarding the Cargill Load are documented, in part, through email between the parties and evidenced by PLS's Award Confirmation.

The Cargill Load was not delivered to its destination, and it was discovered that the GA Trucking's identity had been stolen. The truck used to pick up the Cargill Load was found abandoned and empty on November 24, 2015. The contents of the Cargill Load were never found. It was determined that the Certificate of Insurance presented to PLS by the Carrier (purporting to be GA Trucking) contained a fabricated insurance agent with a non-existent email address and the phone number of a random, unrelated residence. The insurance policy reflected on the Carrier's Certificate of Insurance did not exist. The real GA Trucking did not carry cargo insurance.

## A. Plaintiff's Motion for Summary Judgment

Nicholas Meat first argues it is entitled to judgment for breach of contract because PLS breached the terms and conditions governing the selection of a carrier for the Cargill Load. Nicholas Meat next argues that, separate and apart from PLS's violation of its obligation to verify the legitimacy of the Carrier's cargo insurance, PLS's failure to exercise reasonable due diligence in selecting the Carrier to transport the Cargill Load violated the implied duty of good faith and fair dealing. Nicholas Meat states that PLS's breaches damaged Nicholas Meat and entitle Nicholas Meat to recover the value of the load, plus prejudgment interest. Alternatively, Nicholas Meat argues it is entitled to judgment for negligence, negligent misrepresentation, and promissory estoppel.

7

PLS responds that Nicholas Meat is asking the Court to read into the express terms a number of terms which were not set forth in the Credit Application. PLS contends it did not simply fail or refuse to perform its obligation to require its carrier to carry sufficient cargo insurance for the Cargill Load, but was defrauded.

To successfully maintain a cause of action for breach of contract the plaintiff must establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. *McShea v. City of Philadelphia*, 995 A.2d 334, 340 (Pa. 2010).

> In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement. When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding. This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation.

*Humberston v. Chevron U.S.A., Inc.*, 75 A.3d 504, 510 (Pa. Super. 2013). "Every contract imposes a duty of good faith and fair dealing on the parties in the performance and the enforcement of the contract." *J.J. DeLuca Co. v. Toll Naval Assocs.*, 56 A.3d 402, 412 (Pa. Super. 2012). The obligation to act in good faith in the performance of contractual duties varies somewhat with the context, but strains of bad faith include: evasion of the spirit of the bargain, lack of diligence and slacking off, and willful rendering of imperfect performance. *Somers v. Somers*, 613 A.2d 1211, 1213 (Pa. Super. 1992); RESTATEMENT (SECOND) of CONTRACTS, § 205(d).

There is no dispute that a contract existed between PLS and Nicholas Meat which provided for PLS, as a transportation broker, to arrange for Nicholas Meat's freight to be transported by a third party motor carrier. An essential term of the contract was that PLS would

8

require the motor carrier it selected for the Cargill Load to carry $150,000.00 in cargo loss and damage liability insurance. PLS assumed a contractual obligation to ensure that the motor carrier selected had the specified insurance. Inherent within this obligation was a duty to take reasonable steps to verify that the cargo liability insurance information provided by the carrier was legitimate. PLS breached the terms of the contract by arranging for the Cargill Load to be transported by a third party motor carrier without *any* cargo loss and damage liability insurance. If the Cargill Load had been successfully delivered, Nicholas Meat would have been paid $108,200.10 by its customer. Therefore, as a result of PLS's breach of a duty imposed by the contract, Nicholas Meat suffered damages in the amount of $108,200.10.

For these reasons, the Court finds judgment shall be entered in favor of Nicholas Meat and against PLS for Breach of Contract, Count III of the First Amended Complaint. Inasmuch as the breach of contract claim is determinative in this matter, it is not necessary to consider the alternative theories of recovery proposed by Nicholas Meat.

**B.    Defendant's Motion for Summary Judgment**

*1. Gist of the Action*

PLS contends that Nicholas Meat's tort claims, Count I (Negligence), Count II (Negligent Misrepresentation), and Count IV (Vicarious Liability), of Plaintiff's First Amended Complaint, are barred by the gist of the action doctrine, because the dispute over the Cargill Load stems entirely from a contractual relationship through which PLS provided Nicholas Meat freight brokerage services. Nicholas Meat acknowledges that, if the Court determines as a matter of law that PLS owed Nicholas Meat a contractual duty to exercise reasonable diligence in selecting the Carrier, its tort-based claims are barred by gist of the action.

The "gist of the action" doctrine precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims. *eToll, Inc. v. Elias/Savion Advert., Inc.*, 811 A.2d 10, 14 (Pa. Super. 2002).

> [A]lthough mere non-performance of a contract does not constitute a fraud, it is possible that a breach of contract also gives rise to an actionable tort. To be construed as in tort, however, the wrong ascribed to defendant must be the gist of the action, the contract being collateral. The important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus. In other words, a claim should be limited to a contract claim when the parties obligations are defined by the terms of the contracts, and not by the larger social policies embodied by the law of torts.

*Id.* at 14–15 (internal citations and punctuation omitted). The doctrine bars tort claims: (1) arising solely from a contract between the parties (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract. *Id.* at 19.

> The general governing principle which can be derived from our prior cases is that our Court has consistently regarded the nature of the duty alleged to have been breached, as established by the underlying averments supporting the claim in a plaintiff's complaint, to be the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract. In this regard, the substance of the allegations comprising a claim in a plaintiff's complaint are of paramount importance, and, thus, the mere labeling by the plaintiff of a claim as being in tort, e.g., for negligence, is not controlling. If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract.

*Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014).

In the present case, the liability at issue arises from the contractual obligations PLS owed Nicholas Meat. Thus, PLS's request that this Court dismiss with prejudice Count I (Negligence),

10

Count II (Negligent Misrepresentation), and Count IV (Vicarious Liability) of Plaintiff's First Amended Complaint, as being barred by the gist of the action doctrine is granted.

2. *Preemption by Federal Laws: the Carmack Amendment, 49 U.S.C. § 14706; the Interstate Commerce Commission Termination Act (ICCTA) 49 U.S.C. 14501(b), and the Federal Aviation Administration Authorization Act (FAAAA) 49 U.S.C. § 14501(c)*

PLS states that, while some courts have held that the Carmack Amendment does not, by itself, preempt state law claims against brokers, a number of federal district courts have ruled that the Carmack Amendment, as well as the ICCTA and the FAAAA, preempt state law claims against freight brokers. Nicholas Meat responds that the text and purpose of the Carmack Amendment support the overwhelming majority of courts that have found that claims against brokers are not preempted, and that Section 14501 preemption does not bar Nicholas Meat's Claims.

It its July 13, 2020 Memorandum Opinion and Order of Court, this Court concluded that the Carmack Amendment does not bar state law claims against brokers:

> Effective January 1, 1996, the Carmack Amendment was recodified as part of the Interstate Commerce Commission Termination Act of 1995, 49 U.S.C. §§ 11706 and 14706. *Accu-Spec Elec. Servs., Inc. v. Cent. Transp. Int'l*, 391 F. Supp. 2d 367, 369 (W.D. Pa. 2005). Section 14706 governs the liability of motor carriers and freight forwarders for freight loss or damage. The United States Court of Appeals, Third Circuit, set forth the background of the Carmack Amendment in *Certain Underwriters at Interest at Lloyds of London v. United Parcel Serv. of Am., Inc.*, 762 F.3d 332 (3d Cir. 2014):
>
> At common law, a ground carrier's liability for goods damaged in transit varied from jurisdiction to jurisdiction but was virtually unlimited. Carriers were subject to such a diversity of legislative and judicial holding that it was practically impossible for a shipper to know its potential liability without considerable investigation and trouble. Carriers could, however, generally limit their liability though released value agreements.
>
> Congress first comprehensively addressed interstate carrier liability in the Carmack Amendment to the Hepburn Act of 1906. Pub.L. No. 59–337, 34 Stat. 584. The Amendment adopted much of the common law regime, including the ability of carriers to limit their liability by agreement in a shipment's bill of

11

lading. Originally applicable only to interstate rail shipments, the Carmack Amendment became applicable to motor carriers by the Motor Carrier Act of 1935. Pub.L. No. 74–255, 49 Stat. 543.

The Carmack Amendment's operation is relatively straightforward. The general rule is that an interstate carrier is strictly liable for damages up to the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) [certain intermediary carriers]. A shipper and carrier can agree to limit the carrier's liability to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances in order for the shipper to obtain a reduced rate. Shippers may bring a federal private cause of action directly under the Carmack Amendment against a carrier for damages.

The Carmack Amendment struck a compromise between shippers and carriers. In exchange for making carriers strictly liable for damage to or loss of goods, carriers obtained a uniform, nationwide scheme of liability, with damages limited to actual loss—or less if the shipper and carrier could agree to a lower declared value of the shipment. Making carriers strictly liable relieved a shipper of the burden of having to determine which carrier damaged or lost its goods (if the shipper's goods were carried by multiple carriers along a route). It also eliminated the shipper's potentially difficult task of proving negligence. In return, carriers could more easily predict their potential liability without closely studying the tort law of each state through which a shipment might pass. Carriers' liability was limited to the actual value of the goods shipped—punitive damages were not available.

For over one hundred years, the Supreme Court has consistently held that the Carmack Amendment has completely occupied the field of interstate shipping. Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject, and supersede all state regulation with reference to it. The Court has consistently described the Amendment's preemptive force as exceedingly broad—broad enough to embrace all losses resulting from any failure to discharge a carrier's duty as to any part of the agreed transportation.

The Courts of Appeals have also unanimously held that the Carmack Amendment preempts all state or common law remedies available to a shipper against a carrier for loss or damage to interstate shipments. They have dismissed state and common law claims for breach of contract, negligence, conversion and every other action for loss of or injury to a shipment of goods. Courts of Appeals from the First, Second, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits have consistently held that the Carmack Amendment is the exclusive cause of action for interstate-shipping contract [and tort] claims alleging loss or damage to property. *Certain Underwriters at Interest at Lloyds of London v. United Parcel Serv. of Am., Inc.*, 762 F.3d 332, 334–36 (3d Cir. 2014) (internal citations and quotations omitted). *Lloyds of London* did not involve broker liability. In *Lloyds of London*, state law claims were brought against UPS for twenty-seven missing shipments of coins and/or special metals sent from First

12

State Depository, LLC via UPS. *Id.* at 333. The Third Circuit Court of Appeals held that the Carmack Amendment preempts all state law claims for compensation for the loss of or damage to goods shipped by a ground carrier in interstate commerce. *Id.*

Plaintiff relies upon an unreported case, *AMG Res. Corp. v. Wooster Motor Ways, Inc.*, 796 F. App'x 96, 97 (3d Cir. 2020), for the argument that when claims involve the interstate shipment of goods, shippers may not pursue claims against a transportation broker under the Carmack Amendment nor may shippers pursue any state law claims against a transportation broker. In *AMG*, a shipper brought an action against a carrier and freight broker that arranged for shipment of a truckload of copper that went missing in transit. *Id.* at 97. The motor carrier, Wooster Motor Ways, Inc. shared an address and had common ownership with the freight broker, WMW Logistics, Inc. *Id.* The Court held that AMG could not recover from either entity under the Carmack Amendment because neither Wooster Motor Ways or WMW Logistics was an initial carrier or subsequent carrier. *Id.* The Court further held that since separate state-law claims for loss or damage to good are preempted by the Carmack Amendment, AMG could not recovery on a breach-of-contract theory for the loss or damage to goods. *Id.*

*AMG* is distinguishable from the present case in that the shipper in *AMG* raised both state-law claims and a claim under the Carmack Amendment against two entities, a carrier and a broker and those entities shared an address and had common ownership. It is significant that the Court in *AMG* did not make a distinction between the carrier and the broker. The Carmack Amendment doesn't provide for the liability of brokers; it only applies to "motor carriers and freight forwarders." 49 U.S.C.A. § 14706(a)(1). There is no dispute in the case *sub judice* that Defendant was acting as a broker and not a carrier, and that there is not a cause of action under the Carmack Amendment.

This Court is persuaded by the reasoning in district court opinions in this and other circuits that by remaining silent on the issue of broker liability for the damages of shipped goods, the Carmack Amendment did not intend to afford brokers total immunity from such a suit. *See, Pelletron Corp. v. C.H. Robinson Worldwide, Inc.*, 11-6944, 2012 WL 3104845 (E.D. Pa. July 31, 2012) ("While the Carmack Amendment does not apply to brokers it does not preempt state law claims against brokers.); *Heliene, Inc. v. Total Quality Logistics, LLC*, No. 1:18-CV-799, 2019 WL 4737753, at *2 (S.D. Ohio Sept. 27, 2019) ("[C]ourts in this Circuit have concluded that, while the Carmack Amendment preempts state law claims against <u>carriers</u>, the Carmack Amendment does not preempt state law claims against <u>brokers</u>."); *Commercial Union Ins. Co. v. Forward Air, Inc.*, 50 F. Supp. 2d 255, 257–58 (S.D.N.Y. 1999); (concluding that the Carmack Amendment does not bar suits against brokers); *Custom Cartage, Inc. v. Motorola, Inc.*, No. 98 C 5182, 1999 WL 89563, at *3 (N.D. Ill. Feb. 16, 1999) ("The Carmack Amendment streamlines and simplifies suits against carriers and freight forwarders. It does not exempt brokers from paying for their own negligence or prevent them from entering into contracts with shippers."); *Ross & Wallace Paper Prods., Inc. v. Team Logistics, Inc.*, 2018 WL 8805384 (La. Dist.

13

Ct. Oct. 29, 2018) ("[M]ost courts hold that brokers may be held liable under state tort or contract law in connection with shipments... [PLS's] assertion that any claim in this Court would be prempted by the Carmack Amendment would be contradicted by the cases."); *Oliver Prod. Co. v. Foreway Mgmt. Servs., Inc.*, No. 1:06-CV-26, 2006 WL 2711515, at *1 (W.D. Mich. May 24, 2006) ("[T]he default rule is that a common law claim against a broker is not preempted absent specific statutory language to the contrary."); *Taylor v. Allied Van Lines*, No. CV-08-1218-PHX-GMSHU, 2008 WL 5225809, at *4 (D. Ariz. Dec. 15, 2008); ("The Ninth Circuit's descriptions of the Carmack Amendment do not suggest that the Carmack Amendment forecloses all non-carrier liability... To hold that suit can be maintained against carriers *only* would impose absolute liability on carriers while granting non-carrier entities de facto immunity for all torts they commit in effecting interstate shipping agreements. There is no indication that the Carmack Amendment was intended to apply so indiscriminately.").

Further, the Carmack Amendment contains a savings clause which states, "Except as otherwise provided in this part, the remedies provided under this part are in addition to remedies existing under another law or common law." 49 U.S.C.A. § 13103. This language suggests that the Carmack Amendment should not be read to displace all actions against entities against for which it does not provide liability.

July 13, 2020 Mem. Op. This Court's position on the Carmack Amendment remains unchanged.

Regarding Section 14501, the ICCTA states, in relevant part:

> [N]o State or political subdivision thereof and no intrastate agency or other political agency of 2 or more States shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to intrastate rates, intrastate routes, or intrastate services of any freight forwarder or broker.

49 U.S.C.A. § 14501(b)(1). The FAAAA states, in relevant part:

> [A] State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier (other than a carrier affiliated with a direct air carrier covered by section 41713(b)(4)) or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.

49 U.S.C.A. § 14501(c)(1).

The Court agrees with Nicholas Meat that there is a widespread consensus among courts analyzing these provisions that, while they do apply to freight brokers, they do not preempt

14

breach of contract claims against freight brokers. *ASARCO LLC v. England Logistics Inc.*, 71 F. Supp. 3d 990, 1008 (D. Ariz. 2014) (the statute upon which § 14501 is based does not preempt state-law-based court adjudication of routine breach-of-contract claims' as long as there is no enlargement or enhancement of the contract based on state laws or policies external to the agreement); *Wise Recycling, LLC v. M2 Logistics*, 943 F. Supp. 2d 700, 704 (N.D. Tex. 2013) (negligence claims are Preempted Under FAAAA, contract claims are not); *Mastercraft Interiors, Ltd. v. ABF Freight Sys., Inc.*, 284 F. Supp. 2d 284, 287 (D. Md. 2003) (routine breach of contract claims are not preempted by the ICCTA); *Deerskin Trading Post, Inc. v. United Parcel Serv. of Am., Inc.*, 972 F. Supp. 665, 673 (N.D. Ga. 1997) (breach of contract claims are not preempted by the FAAAA, but claims for punitive damages and injunctive relief based on its breach of contract claim are an enlargement or enhancement of the contract based on state laws or policies and, therefore, are preempted by the FAAAA). Accordingly, the Court finds the ICCTA and the FAAAA do not preempt Nicholas Meat's breach of contract claim against PLS.

Inasmuch as this Court has determined this is a breach of contract claim, the scope of ICCTA and FAAAA preemption with respect to tort claims arising out of a freight broker's selection of a carrier will not be addressed by this Court.

Based on the foregoing, PLS's request that this Court dismiss Counts I – V of Plaintiff's First Amended Complaint as being preempted by federal law is denied.

3. *Evidence that any breach caused Nicholas Meat's alleged damages*

PLS contends that Nicholas Meat cannot maintain a claim for breach of contract because Nicholas Meat's alleged damages were not a direct result of any contractual breach by PLS, but Nicholas Meat's failure to file a claim under PLS's contingent cargo policy, which

15

listed Nicholas Meat as a loss payee. The Court finds Nicholas Meat was not required to attempt recovery through PLS's insurance policy. Moreover, there is evidence in the record that PLS determined that such a claim would not be covered due to the Carrier's fraudulent insurance certificate. Thus, PLS's request to dismiss Count III, Breach of Contract, of Plaintiff's First Amended Complaint is DENIED.

*4. Vicarious Liability*

PLS asserts that Nicholas Meat cannot maintain its claim for vicarious liability (Count IV) because there is no evidence of any master-servant or employer-employee relationship between PLS and GA Trucking and/or the alleged third party who picked up the Cargill Load.

Due to the determination regarding gist of the action, *supra,* which dismisses Nicholas Meat's claim for vicarious liability, the Court finds it is not necessary to address this issue.

*5. Promissory Estoppel*

PLS asserts that Nicholas Meat cannot maintain its claim of promissory estoppel (Count V), as there is no evidence that PLS failed to keep any promises to Nicholas Meat regarding the arrangement of the shipment of the Cargill Load.

Due to the Court's determination that PLS breached a contractual obligation, the issue of promissory estoppel will not be addressed.

Based on the foregoing, the Court enters the following Order:

16

## IN THE COURT OF COMMON PLEAS OF BUTLER COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| **NICHOLAS MEAT, LLC,** | : | **CIVIL DIVISION** |
| | : | |
| **Plaintiff,** | : | **A.D. No. 2017-10872** |
| | : | |
| v. | : | |
| | : | |
| **PITTSBURGH LOGISTICS SYSTEMS, INC.** | : | |
| **d/b/a PLS LOGISTICS SERVICES,** | : | |
| | : | |
| **Defendant.** | : | |

2021 OCT 27 PM 2: 3[ ]

PROTHONOTARY'S OFFICE
BUTLER COUNTY
ENTERED & FILED

### ORDER OF COURT

**AND NOW**, this **27** day of October, 2021 upon consideration of the opposing Motions for Summary Judgment and Briefs and Memoranda of Law in support and in opposition, the oral argument of counsel, and upon review of the entire record, and for the reasons stated in the foregoing memorandum opinion, it is hereby **ORDERED, ADJUDGED and DECREED:**

1. Plaintiff's Motion for Summary Judgment is GRANTED as to Breach of Contract, Count III of Plaintiff's First Amended Complaint. Judgment shall be entered in favor of Plaintiff, Nicholas Meat, LLC, and against Defendant Pittsburgh Logistics Systems, Inc. d/b/a PLS Logistics Services in the amount of $108,200.10 plus prejudgment interest calculated at a rate of 6% per annum from November 24, 2015 until the date of judgment.

2. Defendant's Motion for Summary Judgment is granted in part and denied in part as follows:

17

a. Defendant's request that Count I (Negligence), Count II (Negligent Misrepresentation), and Count IV (Vicarious Liability) of Plaintiff's First Amended Complaint be dismissed with prejudice as being barred by the gist of the action doctrine is GRANTED.

b. Defendant's request that Counts I – V of Plaintiff's First Amended Complaint be dismissed as being preempted by federal law is DENIED.

c. Defendant's request for dismissal of Count III, Breach of Contract, of Plaintiff's First Amended Complaint is DENIED.

**BY THE COURT:**

**THOMAS J. DOERR,**
**President Judge, Butler County**

18

In The Court Of Common Pleas Of
Butler County Prothonotary's Office
Civil Action - Judgment
Notice of Entry of Judgment


October 28, 2021


PITTSBURGH LOGISTICS SYSTEMS                    No.: 2021-21421
INC
3120 UNIONVILLE ROAD

CRANBERRY TOWNSHIP PA 16066


You are hereby notified that a judgment in the amount of ____ $108,200.10
has been entered against you on October 28th 2021 in the Court of
Common Pleas of Butler County Prothonotary's Office at the above number
and term.


Please note this is not a law suit or a bill. It is simply a notification
of the Recording.


   Plaintiff(s)
NICHOLAS MEAT LLC                          _____
                                           Prothonotary
   ** VERSUS **


   Defendant(s)
PITTSBURGH LOGISTICS SYSTEMS
INC
PLS LOGISTICS SERVICES

In The Court Of Common Pleas Of
Butler County Prothonotary's Office
Civil Action - Judgment
Notice of Entry of Judgment

October 28, 2021

PLS LOGISTICS SERVICES                    No.: 2021-21421
3120 UNIONVILLE ROAD

CRANBERRY TOWNSHIP PA 16066

--- 
                                                              ---

You are hereby notified that a judgment in the amount of ___$108,200.10
has been entered against you on October 28th 2021 in the Court of
Common Pleas of Butler County Prothonotary's Office at the above number
and term.

Please note this is not a law suit or a bill. It is simply a notification
of the Recording.


     Plaintiff(s)                          _____
NICHOLAS MEAT LLC                          Prothonotary

     ** VERSUS **

     Defendant(s)
PITTSBURGH LOGISTICS SYSTEMS
INC
PLS LOGISTICS SERVICES